UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

David Gorvitz - NJ Attorney ID #046302006
**ORLOFF, LOWENBACH, STIFELMAN & SIEGEL, P.A.**
101 Eisenhower Parkway, Suite 400
Roseland, New Jersey 07068-1097
(973) 622-6200
dg@olss.com

*-and-*

Elizabeth Wolstein (admitted *pro hac vice*)
Lyndon M. Tretter (admitted *pro hac vice*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, New York 10004
(212) 344-5400
ewolstein@schlamstone.com
ltretter@schlamstone.com

*Attorneys For Plaintiff Kevin Steed*

| | |
|---|---|
| In Re:<br><br>ROBERT L. TOONE and STACY-ANN E. TOONE aka STACY ANN E. PALMER aka STACY-ANN E. PALMER-TOONE,<br><br>Debtor(s). | **Case No.: 15-30535 (JKS)**<br><br>**Chapter: 7**<br><br>**Judge: Honorable John K. Sherwood** |
| KEVIN STEED,<br><br>*Plaintiff,*<br><br>*-against-*<br><br>ROBERT L. TOONE and STACY-ANN E. TOONE aka STACY ANN E. PALMER aka STACY-ANN E. PALMER-TOONE,<br><br>*Defendants.* | **ADVERSARY PROCEEDING NO: _____** |

1

**COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
PURSUANT TO SECTIONS 523 AND 727 OF THE BANKRUPTCY CODE, AND FOR
ADJUDICATION OF RELATED STATE LAW CLAIMS**

Plaintiff-Creditor Kevin Steed, through his attorneys Orloff, Lowenbach, Stifelman &

Siegel, P.A. and Schlam Stone & Dolan LLP, alleges the following as his Complaint against

Defendants-Debtors Robert L. Toone and Stacy-Ann E. Toone aka Stacy Ann E. Palmer aka

Stacy-Ann E. Palmer-Toone ("Defendants," "Debtors," or the "Toones"):

## NATURE OF THE ACTION

1.      This is an action for a determination that the debt owned by Defendants to

Plaintiff is non-dischargeable based on Defendants' fraud, breach of fiduciary duty, and

misappropriation of Plaintiff's interest in a successful business, and based on the fraudulent

nature of this bankruptcy.

2.      Plaintiff Kevin Steed was the partner of defendant Robert Toone until Toone stole

the business, and Mr. Steed's share of it, less than a year before filing this bankruptcy.  In June

2013, Steed and Toone signed a partnership agreement, by which they became 50/50 partners in

the business they created to sell and install accessibility and mobility-related durable medical

equipment, Easy Access Homes, LLC ("EAH").  Steed developed the marketing, sales, internet,

and accounting infrastructure, secured authorized dealer status for one of the biggest brands in

the industry, and developed the strategy that would help EAH take off:  to become a vendor

approved to do business with the Department of Veterans Affairs (the "VA").  In little more than

a year, the Company was obtaining several jobs per week from VA facilities, earning profits

which, annualized, would have come to half a million dollars or more.

3.      Soon after the VA business had taken off and was earning EAH a healthy profit,

Robert Toone ("Rob") announced to Mr. Steed ("Kevin") that he wanted to shut down the

2

business.  Rob claimed the work was causing him stress and that he and Kevin had too many

differences to be able to function over the long term.  Robert Toone said he wanted to close

down the company, liquidate its assets, and move on to something else.

4.      In early December 2014, Rob wrote emails under the two men's names informing

customers and suppliers that the business was shutting down.  As it turned out, however, Rob

never intended to shut the business down, and did not in fact shut it down, but rather froze Kevin

out while taking steps, with his wife, defendant debtor Stacy Palmer-Toone ("Stacy"), to carry

on the business without Kevin.  Only days before and after Rob's fraudulent November 29, 2014

announcement to Kevin, Rob and Stacy made the filings in the State of New Jersey to continue

EAH's business under the name ProMobility, LLC ("ProMobility") "DBA Easy Access Homes,"

thereby holding ProMobility out to EAH's customers and vendors as the same old EAH.

ProMobility was indeed a continuation of EAH; the only difference is that Rob and Stacy had

frozen out Kevin Steed.

5.      Within days of the supposed shut down of EAH, Robert Toone was again doing

business with EAH's suppliers and the VA.  In the first two weeks of December 2014 alone,

Robert Toone completed at least five jobs bid on by and awarded to EAH, and he and Stacy

Toone kept the tens of thousands of dollars in proceeds to themselves, when in fact 50% of the

proceeds belonged to Kevin.  In the first half of 2015 the Toones stole additional jobs that had

been awarded to EAH, caused ProMobility to complete the jobs, and kept the proceeds for

ProMobility and themselves rather than turning over to Mr. Steed his 50% share.

6.      To recover for Robert Toone's breaches of fiduciary duty, breaches of contract,

and other wrongs, and for Stacy Toone's aiding and abetting her husband's wrongdoing, Plaintiff

and EAH sued the Toones, ProMobility, and Robert Toone's father Richard Toone in New

Jersey state court in February 2015, *see Steed v. Toone, et al.*, No. C-104-15 (Chancery Div.,

Morris County) (the "State Court Action").

7.      In late July 2015, Mr. Steed and EAH obtained a temporary restraining order in

the State Court Action that among other things required the Toones and ProMobility to submit

bi-weekly reports setting forth ProMobility's revenues and expenses and prohibited the

defendants from dissipating the company's funds.  On September 16, 2015, the court in the State

Court Action issued a further order granting Mr. Steed's and EAH's motion for a preliminary

injunction and ordered ProMobility to (a) escrow 10% of its monthly revenues and (b) submit

monthly reports, with supporting documentation, detailing its revenues, income, and expenses.

The September order also continued the July 2015 non-dissipation provision intended to prevent

the Toones from frustrating Plaintiff's ability to recover for the Toones' wrongdoing.  A true

copy of the September 16, 2015 preliminary injunction order in the State Court Action (the

"Preliminary Injunction Order") is attached hereto as Exhibit A.

8.      On or about October 12, 2015, Rob, Stacy, and ProMobility submitted their first

monthly report under the Preliminary Injunction Order.  It was riddled with false and

inconsistent entries and devoid of any supporting documents of the kind ordered be produced to

verify the reporting.  The Toones and ProMobility also made their first escrow deposit, which

was for less than the required 10% of revenues, according to the Toones' and ProMobility's own

reporting.

9.      That same month (October 2015), ProMobility earned more revenue than it ever

had in a single month—at least $117,000, a figure reflecting the company's credit card sales

alone.  Notwithstanding the success of ProMobility (which, again, was nothing more than a

4

continuation of EAH without Kevin Steed) and the fact that Stacy was employed full-time, the Toones filed this bankruptcy petition on October 30, 2015.

10.     Plaintiff later learned at the Creditors Meeting that during this same period, days or weeks before filing for bankruptcy, the Toones voluntarily shut down ProMobility and stripped it of all its assets and funds, rather than comply with the Preliminary Injunction Order and leave funds in existence that could be used to satisfy their ongoing escrow obligations and what they knew was a likely judgment against them.

11.     Beyond intentionally moving ProMobility's substantial profits out of reach of Mr. Steed, the Toones were also in bad faith attempting to manufacture their own purported basis for bankruptcy:  no ProMobility, no salary and no profits—salary and profits that had been supplementing Stacy's salary for the prior ten months.

12.     Robert Toone committed fraud, breaches of fiduciary duty, and breaches of contract in freezing Steed out of EAH under false pretenses, and based on knowingly false statements, in order to continue the business with his wife and without Mr. Steed, keeping for himself Steed's share of business revenues, and failing to account to Steed for the value of the ongoing business he stole, and is liable to Mr. Steed accordingly.  Together with Joint Debtor Stacy Toone, Robert Toone stole Mr. Steed's share of the proceeds of jobs bid on and won by EAH but completed by ProMobility, and deprived Mr. Steed of hundreds of thousands of dollars in revenue, through fraud, deceit, and intentional breaches of fiduciary duty.  Accordingly, defendants' liability to Plaintiff is not dischargeable.

13.     The Toones' liability to Plaintiff is also not dischargeable because they intentionally removed, transferred, and concealed assets and destroyed ProMobility in the weeks before their bankruptcy filing for the doubly unlawful purpose of making themselves purportedly

bankrupt and hindering Plaintiff's efforts to recover in the State Court Action.  At the meeting of

creditors in December 2015, the Toones testified that they had shut down ProMobility, a

functioning, successful business, in October 2015, leaving it with only $500 in the bank, even

though the company had by that point earned $500,000 in revenue, according to Stacy Toone's

sworn testimony, in the first 10 months of its existence.  This asset-stripping was in manifest

violation of the non-dissipation provision of the Preliminary Injunction Order and carried out for

no other purpose than to hinder Plaintiff's ability to recover on the Toones' liability to Plaintiff

and try to claim bankruptcy so as to immunize themselves from Plaintiff's increasingly

successful efforts to obtain relief in the State Court Action.

14.     The Toones continued to strip themselves of assets after they filed for bankruptcy.

In November 2015, Robert Toone transferred title to EAH's truck, one of EAH's principal

remaining hard assets, to the owner of a storage facility where the Toones had been storing

inventory of EAH and ProMobility, receiving nothing in return.  At the time of the transfer, the

estate owned 50% of the truck and Mr. Steed owned the other 50%.

15.     The sole purpose of this bankruptcy is to deprive Mr. Steed of the ability to

recover for the Toones' theft of the business that was half his.  These facts make the Toones

ineligible for a discharge under Section 727(a)(2) of the Bankruptcy Code.

16.     To further their purpose of frustrating and defeating Mr. Steed's rights as a

creditor, the Toones have filed a bankruptcy petition that is fraudulent.  The Toones are not

bankrupt.  They had a successful business, albeit one that they stole after Mr. Steed made it

successful, through which they were earning substantial income.  They decided to shut it down to

evade a creditor, and now complain that they don't have enough income to pay their bills.  That

is not a basis for bankruptcy.

17.    The petition contains multiple, knowing false claims of debt, and material omissions and undervaluations of assets.  Enough discrepancies came out in a mere 10 minutes of questioning at the Creditors Meeting that the Chapter 7 Trustee directed the Toones to file amended schedules.  Yet the Toones' amended filing did not correct the falsehoods and omissions; it merely added a single entry on the Toones' list of assets, namely, Robert Toone's partnership interest in EAH, which they valued at $100 (and falsely dubbed a "joint" asset). Nothing else was changed, and the fraudulent entries and material omissions continue to infect the Toones' presentation to this Court, on the basis of which they seek to discharge their debts.

18.    These facts render Defendants ineligible for discharge on the additional grounds set forth in 727(a)(4).

## JURISDICTION

19.    On October 30, 2015, Debtors filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey.

20.    On December 10, 2015, a creditors' meeting was held pursuant to Section 341(a) of the Bankruptcy Code.

21.    As of the date of this Complaint, Debtors have not been granted a discharge.

22.    This Complaint is timely because the deadline for bringing a complaint to determine dischargeability is February 8, 2016.

23.    This is an adversary proceeding in which Plaintiff is seeking (i) a determination as to the liability for and dischargeability of debts owed by Debtors to Plaintiff under Bankruptcy Code §§ 523(a)(2), 523(a)(4), and 523(a)(6), and §§ 727(a)(2)(A) and 727(a)(4), and (ii) adjudication of their closely-related state law claims against Debtors that were pending in the

State Court Action  as of the filing of Debtors' petition and have been automatically stayed since then, as to which this complaint asserts Debtors are not entitled to discharge.

24.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, and § 157(a) and (b).  The Court has "related to" jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § §157(a) and 157(c)(1)

25.    To the extent Plaintiff is seeking determinations of non-dischargeability, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Plaintiff's state law claims constitute a non-core proceeding that is related to Debtors' case within the meaning of 28 U.S.C. § 157(c)(1).

## THE PARTIES

26.    Plaintiff Kevin Steed is an individual residing at 34 Lorettacong Drive in Lake Hopatcong, New Jersey 07849, and is a creditor in this case.

27.    Plaintiff EAH is a limited liability company organized under New Jersey law and used as its main business address Steed's home address of 34 Lorettacong Drive in Lake Hopatcong, New Jersey 07849, and is a creditor in this case.

28.    Defendant Robert Toone is an individual residing at 12 Winona Trail, Lake Hopatcong, New Jersey, and is one of the two joint debtors in this case.

29.    Defendant Stacy-Ann Palmer-Toone is an individual residing at 12 Winona Trail, Lake Hopatcong, New Jersey, is the wife of defendant Robert Toone, and is the other joint debtor .

## STATEMENT OF FACTS

### A.  Plaintiff's Business Plan For What Became Easy Access Homes LLC

30.    In 2013 Robert Toone asked Kevin Steed for help in setting up a company to sell and install mobility and accessibility related durable medical equipment, such as wheelchair

ramps, stair lifts, vertical platform lifts, and the like.  Kevin researched the industry, customer

demographics, and regional architecture layouts; evaluated various business models; and

evaluated projected financials and startup costs.  After about two weeks of research, Kevin went

back to Rob and explained that he thought the business was a great idea for him and his family,

that he could do it inexpensively and that he would be successful if he set it up and ran it

correctly.  During the meeting, Kevin created a business project plan on a legal pad that he told

Rob he should follow in order to set up the company.  Kevin handed the plan to Rob, wished him

the best of luck, and offered to help if Rob had further questions.

31.     About three months later (around April 2013), Rob confessed to Kevin that he had

made no solid progress and that he and his wife had no idea how to carry out the steps Kevin had

outlined.  He said he needed a competent and knowledgeable business partner to develop and

complete the technological systems and administrative processes necessary to establish and

operate the business.  Rob told Kevin that because he didn't know how to set up the company or

get it moving he wanted Kevin to become his 50/50 partner in the business.  He wanted Kevin to

set it up, focus on growing the business, and on information technology (IT) and marketing, and

that he (Rob) would focus on product installations and customer interactions.

32.     Kevin told Rob he liked the idea but could not forego work in consulting and

financial industry, where he had his career, to take up work on the business full time during

regular business hours.  Kevin said he would work on the business while he wasn't working

elsewhere and that when he was working in his regular field of business he would focus on it at

night and on the weekends, explaining that he couldn't abandon his career for a new venture the

success of which was at that point still uncertain.

33.    After further discussion that included Rob's wife Stacy, Rob and Kevin agreed that Rob and Kevin would enter into a 50/50 partnership to create and run a mobility-related medical equipment business.

34.    Rob and Kevin entered into a Partnership Agreement on June 21, 2013 (the "Partnership Agreement").  A true copy of the Partnership Agreement is attached as Exhibit A to the amended complaint in the State Court Action, which is itself attached as Exhibit B hereto as noted below.  Stacy helped register EAH as a New Jersey LLC in June 2013.

**B.  The Partnership Agreement**

35.    Under the Partnership Agreement Rob and Kevin were 50/50 partners.  There were no other partners.

36.    The Partnership Agreement provides, among other things, that:

- "[e]ach Partner shall have an equal voice in the management of the Partnership" (¶ 16);

- each partner "shall have authority to bind the Partnership in making contracts and incurring obligations in the name and on the credit of the firm.  However, no Partner shall incur any obligations in the name or on the credit of the firm exceeding $2,500 without the express written consent of the other Partner."  (¶ 16);

- "On dissolution of the Partnership by the withdrawal or other act of a Partner, the remaining Partner, on written notice to the other Partner within 30 days of the dissolution, may continue the business by purchasing the interest of the other Partner in the assets and good will of the Partnership."  (¶ 19); and

- "On dissolution of the Partnership other than as provided in Paragraphs in this Agreement, the affairs of the Partnership shall be wound up, the assets of the Partnership liquidated, the debts paid, and the surplus divided equally among the Partners."  (¶ 24).

**C.  Kevin's Legwork To Get the Business Up and Running**

37.    Kevin spent the first three months of the partnership focusing on establishing the company; redesigning the logo; developing business cards, brochures, posters, shirts, and various

other marketing materials; setting up and building a website and customer relationship management ("CRM") system; establishing relationships with vendors; and otherwise getting ready to launch the business.  Kevin set up a bank account in the Company's name.  Rob wanted Stacy to also have authority over the account because Stacy handled all their personal finances, and Kevin agreed.

38.    In addition to designing the CRM system, Kevin set up and configured software the Company would use for its accounting system and credit card processing, fax and voice answering service.  He also developed accounts receivable software.

39.    Kevin also researched and analyzed potential suppliers.  He personally developed and secured supplier relationships with Harmar, a lift supplier, TJ Rampit, a supplier of wheelchair ramps, Handicare, another supplier of lifts along with other devices for the disabled, and Open Sesame Door Systems, a supplier of remote control door systems.  Rob, by contrast, did virtually none of the necessary legwork.  He did not assist in developing the marketing, sales, or operations infrastructure.

40.    On July 4, 2013, the Company was officially launched with a fully integrated website, Customer Relationship Management (CRM) system (to store and track customers, sales, product inventory and leads), marketing materials, accounting system, voice answering service, shirts and other promotional materials, and craigslist ads.  But growth was limited during the first 10 to 12 months.  Due to the Toones' lack of credit, Kevin had to fund all outlays for inventory and training during this period the company was getting off the ground.

**D.  Business Picks Up In The Fall of 2014**

41.    After limited success in pitching the VA as a customer during 2013, in the summer of 2014 EAH became approved as a vendor qualified to do business with the VA.  This

meant that it would have an opportunity to submit bids for jobs at the Castle Point medical center

and six other VA medical centers.  Equally important, EAH was now fully established in the

Federal Government's contractor System Award Management (SAM) and could do business

with other VA locations as well.

42.      EAH submitted its first bid to the Castle Point VA in response to an RFP in or

around May 23, 2014, and was awarded the contract in or around July 2014.  The Company

subsequently became an accredited service provider for the VA in East Orange, New Jersey.

43.      In October of 2014, EAH started seeing a substantial increase in the number of

requests for quotes from the VA, most of which were attributable to the East Orange location.

The Company was receiving some five to eight quotes a week, and week after week had virtually

every one of its bids accepted.  The individual contracts were valued at between $3,000 and

$15,000 each, and these had approximately 60% gross margin on the smaller jobs and 35% gross

margin on the larger jobs.  The East Orange VA told EAH that the administration liked and

wanted to keep using EAH to supply stair lifts, ramps and vertical platform lifts.

44.      At the rate the VA business was going in October 2014, EAH was on track to

make a profit of over $500,000 per year from the East Orange VA location alone.  To build upon

the VA success, EAH began seeking out business from other regional VA medical centers, and

Kevin and Rob started discussing hiring installers and using warehouses to allow the Company

to handle a higher volume of business.

**E.  Kevin's Ongoing Development And Funding Of The Business**

45.      Kevin continued to work in other ways to develop and expand the business.  He

increased EAH's internet visibility by optimizing users' search engine results, with the result that

EAH went from being on the bottom of page 5 of search results to number 3 on page 1 of the

search engine results.  This resulted in a substantial increase in the number of people contacting

EAH for potential jobs.  The increased internet visibility also generated a new business line in

refurbishing then selling used equipment.  EAH began receiving daily offers to buy used

products, such as previously owned lifts, which created a reliable source of low-cost product for

the used durable medical equipment market.  Soon EAH began acquiring a steady flow of

inventory it could sell to customers seeking discounted mobility solutions, filling a niche in what

had been an underserved market.

46.     Kevin also took charge of internet advertising, marketing initiatives, accounting,

and sought out strategic growth opportunities, including investigating the potential for

manufacturing its own products like wheelchair ramps, and establishing additional customer

relationships beyond the VA.  As a result of his efforts, EAH became approved as a vendor to the

New Jersey Division of the Developmental Disabilities ("DDD").  When EAH received its first

request from DDD to bid on a job, Kevin developed the formal bid. Kevin also secured important

discounts with vendors that gave EAH a competitive advantage by allowing EAH to charge

customers less.

47.     Throughout 2013 and 2014, Kevin continued to fund virtually all of the purchases

for the business, laying out money—from $3,000 to $15,000 per purchase—until EAH could

reimburse him from payments on its accounts receivable.  Kevin also personally funded the

purchase of the EAH truck.  The company's use of Kevin's personal funds was necessary

because EAH was unable to obtain a business credit line (since it lacked sufficient credit

history), and Rob had poor credit.

**F.  Rob Fraudulently Induces Kevin To Agree To (Supposedly) Shut Down The
Company So He Can Steal The Business And Continue It With His Wife**

48.     To Kevin's great surprise, on November 29, 2014, Rob announced that he no

longer wanted to continue the partnership.  He said that the business was causing him too much

stress, that he and Kevin had too many differences, and that because of their differences being in

business together was not going to work in the long-term.  In conversations over the next few

days, Rob reiterated that he no longer wanted to be in business with Kevin, wanted to shut down

the business and sell the assets and move on to something else.

49.     Kevin strongly argued against shutting down the business, but could not persuade

Rob.  Kevin agreed to Rob's plea to shut it down—based on Rob's explanation that he wanted to

close down the business, his promise that the assets would be sold and the proceeds divided 50-

50 as required under the Partnership Agreement, and statements that he wanted an amicable

dissolution of the business based on their 10-year friendship.  Since Rob had previously done a

variety of other jobs to earn money and continued with some of them while he was with EAH,

Kevin believed him when Rob said he wanted to go back to doing other things.

50.     During the first few days of December 2014, Toone took the lead in emailing the

VA and EAH's largest vendors to announce that EAH was closing down and copied Kevin on all

the emails leading him to believe the shut-down was legitimate.  Discovery in the State Court

Action revealed, however, that at the same time Rob was informing vendors and the VA that

EAH was shutting down, he was working with these same entities to remove Kevin's name from

accounts, placing orders with the vendors, asking the VA to transfer jobs that EAH had won to

Rob's new company, and completing paperwork to continue doing business with the same

customers and vendors using at least two entity names always followed by the designation "DBA

Easy Access Homes."

51.     Only later did it become apparent that Rob's statements were false and he used

them to induce Kevin to agree to shutting down the business so he could freeze Kevin out and

take over the operations of EAH with his wife and father, without accounting to Kevin for his

half of the profits or buying him out as required by the Partnership Agreement.  Had Rob told

Kevin the truth—*i.e.*, that he wanted to simply appropriate Kevin's share of EAH, the profits

from EAH's jobs in the pipeline with customers, and the business itself so he could run the

business with his wife instead, Kevin never would have agreed to shut down the business (which

of course was not really shut down), or he would have invoked the clause in the Partnership

Agreement governing one partner's continuation of the business so a proper valuation could be

performed and a purchase price of Kevin's share of the business could be established.

52.     Kevin and Rob never entered into a written agreement dissolving or shutting

down the Company, much less one modifying the terms of the Partnership Agreement to allow

Rob to continue the business without Kevin but without buying him out.  The Partnership

Agreement is the only written agreement between Rob and Kevin concerning EAH.

**G.  Rather Than Shutting Down EAH, Toone Stole The Business And Steed's Share
     And Immediately Transferred EAH's Pending Jobs, Assets, Goodwill, And
     Customers and Vendors To ProMobility, Then Continued EAH's Business Via The
     ProMobility LLC**

53.     Discovery produced in the State Court Action by EAH's vendors has showed that

within a matter days after Robert Toone's November 29, 2014 announcement that he wanted to

shut down EAH and go do something else, Robert Toone and Stacy Toone caused ProMobility to

pick up where EAH left off, while laying the groundwork for a seamless transition from EAH to

ProMobility via the out-and-out theft of the EAH business.

54.     By November 19, 2014, Defendants had already set up ProMobility by a New

Jersey corporate filing that referred to ProMobility as "DBA Easy Access Homes," enabling it to

trade on EAH's good name and goodwill with its customers and vendors.  Thus, by the time Rob

announced to Kevin 10 days later that he wanted to shut down EAH, he had already taken steps

to continue the business under EAH's name but without Kevin.

55.     On or about December 8, 2014, EAH received an email from its insurance

company confirming that the Company's insurance policy had been renewed, but in the name of

"ProMobility LLC DBA Easy Access Homes."  .

56.     On December 12, 2014, Stacy Toone took action to renew the Company's web

address of "EasyAccessHomes.com" for three additional years, and move the website off its web

hosting service to an alternative hosting service so the website could continue to exist elsewhere.

Kevin learned from the web hosting company that Stacy had contacted them and that her name

was now on file as the purchasing agent for the new web hosting contract.  The representative

said, in substance, that Stacy bought the name for another three years and it looked like she was

going to move the website somewhere else to be hosted.

57.     The net effect of changing web hosting companies was that Kevin no longer had

visibility into any new emails EAH received at its general email address,

info@easyaccesshomes.com, while the website was preserved for use by Robert Toone and

Stacy Toone for continuing the EAH business with the new "ProMobility" name while

capitalizing on EAH's prior marketing and web search efforts.

58.     Emails from Robert Toone in early December 2014 show that Toone was

following up with EAH customers to complete EAH jobs without informing Mr. Steed.  On

December 3 and 4, 2014, at least five jobs valued at a total of $43,000 were awarded to EAH by

the VA.  Rob did not inform Kevin.  Rob forwarded the VA's award emails to himself then

deleted them so as to conceal them from Kevin, who only much later was able to retrieve them from the trash folder.

59.     Toone completed the jobs through ProMobility, and when the VA forwarded payment to ProMobility, Toone did not share the proceeds with Steed.

60.     During the first 10 to 14 days of December 2014, Toone sent emails to EAH's vendors and customers seeking to create the impression that ProMobility was a continuation of EAH, and holding it out as such in other ways.  For example, he and Stacy Toone set up the email address eahinstall@gmail.com to use for receiving emails from customers and vendors. (The Toones stopped using this address only after they realized they had been caught.).  In addition, in emails with suppliers, New Jersey corporate filings, and vendor paperwork they referred to ProMobility as "dba Easy Access Homes."  Stacy was typically the one who took care of the filings and the paperwork.

61.     In the first quarter of 2015, ProMobility completed at least nine, and possibly more, additional jobs that had been awarded by the VA to EAH.  When ProMobility was paid for the jobs, the Toones kept the proceeds and did not turn over to Mr. Steed his 50% share.

62.     Until at least May 2015, ProMobility continued to use the EAH name in doing business with the VA to deceive the relevant VA personnel into believing that ProMobility was really just EAH by another name.

H.  **Despite Its Substantial Revenues, The Toones Shut Down ProMobility And Stripped It Down To A Shell To Prevent Mr. Steed From Collecting On Their Liability To Him And To Create Their Own Purported, But Fraudulent, Basis For Bankruptcy**

63.     Based on the early evidence he pieced together in December 2014 and January 2015 about the Toones' activities, Mr. Steed brought the State Court Action in February 2015.  A

17

true copy of Plaintiff's Amended Complaint in that action, dated August 4, 2015, is attached

hereto as Exhibit B and incorporated herein by reference.

64.      ProMobility continued to operate in 2015 and in the first 10 months of the year

generated more than $550,000 in revenue from credit card sales alone, according to documents

produced pursuant to Plaintiff's Rule 2004 subpoenas.

65.      As noted, on July 30, 2015, Plaintiff and EAH obtained a temporary restraining

order (TRO) in the State Court Action directing the defendants, pending the Court's hearing of

their Preliminary Injunction and Attachment motion, to submit bi-weekly reports detailing

ProMobility's revenues and expenses, and prohibiting the defendants from dissipating

ProMobility funds.

66.      On September 16, 2015, the Court in the State Court Action issued the

Preliminary Injunction Order based on its determination that the Plaintiffs had shown "there is a

sufficient basis for me to conclude that something has to be done to preserve what could be, what

may well be, the Plaintiff's interest."  Transcript of August 27, 2015 Oral Argument on Order to

Show Cause for Preliminary Injunction in State Court Action, at 53.  A true copy of that

transcript is attached hereto as Exhibit C.

67.      Between October 9 and 12, 2015, the Toones and ProMobility made

ProMobility's first escrow deposit and submitted its first monthly report.  As it turned out, these

were to be their only such submissions and even these were not compliant with the Preliminary

Injunction Order in that the escrow amount fell short and the reporting was almost entirely

unsupported, as well as incomplete and filled with seemingly false and/or padded entries.

68.      In the next step of their plan to evade the ongoing monetary relief and eventual

judgment against them in the State Court Action, the Toones filed this personal bankruptcy on

October 30, 2015.  They did not place ProMobility into bankruptcy, however.  They simply stripped it of all of its assets and funds, and for now have stopped taking any new work orders through it.

69.     At the time they shut it down, ProMobility was a successful, profitable business. The Toones shut it down voluntarily (for now) to eliminate a portion of their income so as to qualify for bankruptcy through which they sought to discharge their liability to Mr. Steed.

70.     Plaintiff did not learn of this asset stripping of non-debtor ProMobility until it was elicited under questioning by the Chapter 7 Trustee at the Creditors Meeting on December 10, 2015 (the "Creditors Meeting"), by which time, according to Stacy Toone's testimony, it was a fait accompli.

## I.   Debtors' Fraudulent Bankruptcy Filing And False And Incomplete Bankruptcy Petition

71.     At the time they filed their bankruptcy petition, the Toones were not really insolvent.  They had a source of ample income in ProMobility (plus income from Stacy's full-time employment), but chose to destroy or suspend operation of ProMobility to prevent Mr. Steed from collecting on their liability to him.  Having eliminated by choice one source of significant income, they promptly filed for bankruptcy.

72.     Consistent with the fraudulent nature of this bankruptcy, Debtors' bankruptcy petition is riddled with false claims of debt, knowing undervaluation of assets, and material omissions of assets.

73.     For example, the Petition lists several purported debts that are not in fact debts of the Debtors.  In one example, the Petition lists Sharon Lynn Shauble, CPA, as a creditor to whom the Toones claim to owe $2,100.  *See* Bankruptcy Petition, as electronically filed (the

"Petition"), at page 20 of 47.  Ms. Schauble, however, was the CPA for EAH and the unpaid

balance on her invoices, if any, is a liability of EAH, not the Joint Debtors.

74.     Similarly, the Petition lists a debt of $3,702.47 on a Chase credit card ending in

8292.  *See* Petition, at page 18 of 47.  However, ProMobility's bank statements show that this

credit card was being paid off monthly by ProMobility, not Debtors.  Accordingly, there is

reason to believe that this credit card belongs to ProMobility and that the balance listed on the

Petition is a liability of ProMobility, not Joint Debtors.  Moreover, even if it Debtors' personal

credit card, they had the means to pay and were paying this liability monthly through

ProMobility, and it cannot be considered a genuine debt of Debtors, or a debt they are

involuntarily unable to pay.

75.     Also, the Petition lists a debt of $420 to U Stor It, a storage facility in New Jersey.

Again, however, ProMobility's bank statements show that this purported creditor was being paid

hundreds of dollars monthly out of bank accounts of ProMobility, revealing either that the $420

is a debt of ProMobility, or that the Toones had the means to pay and were paying the debt using

ProMobility funds.  The Toones' phone bills also had been paid out of the business for the prior

12 months.

76.     Information from U Stor It has revealed that Robert Toone settled his debt to the

storage company, if there was one given the monthly payments to U Stor It ProMobility was

making, by turning over the title to EAH's truck post-petition, in late November or early

December 2015.

77.     As for omissions, the Petition failed to disclose Stacy Toone's substantial income

from ProMobility which is estimated at over $40,000 according to bank records reflecting draws

taken out by Stacy that are not disclosed in the bankruptcy filings, state court reporting, or the

accounting records provided by the Toones in response to Plaintiff's Rule 2004 subpoena. Some

of that paper trail also shows that the Toones used the draws to pay their personal mortgage—

pre-tax. Robert Toone also failed to disclose his 50% interest in EAH, and Stacy failed to

disclose her valuable engagement ring, the purchase of which was funded by a wealthy family

the Toones have embraced as their financial benefactors (Maria and her family), who has also

put Stacy in her will, as Stacy proudly announced to Kevin one day. Stacy testified at her Rule

2004 examination that Maria has provided funding for the Toones' living expenses, a fact not

disclosed in the bankruptcy petition, as Stacy admitted.

78.     The Toones also failed to list as assets on the Petition Robert Toone's substantial

inventory of tools, some of which were funded by the proceeds from ProMobility, and firearms;

the family's televisions and electronic equipment; cell phones; vehicles owned by Robert Toone

that he keeps parked at his parents' home elsewhere in New Jersey; and revenues from Mr.

Toone's car stereo business and other side business ventures including working for Blue Clone

Networks, and a motor cycle and car flipping business.

79.     Finally, the Petition knowingly undervalues major assets. The Toones valued

their interest in ProMobility at $100. Yet the company's bank statements show that it earned

more than $550,000 in credit card sales alone in the first 10 months of 2015, before the Toones'

voluntarily stopped operating the business (for now). ProMobility's tangible and intangible

assets alone, which include a Ford Transit SUV that Robert Toone testified at the Creditors

Meeting was worth $15,000, are worth tens of thousands of dollars.

80.     Similarly, the Toones listed the value of their 1965 Oldsmobile 442 as $100, *see*

Petition at page 13, even though this vintage car is typically offered for sale at prices upwards of

$10,000 or $20,000, and refurbished models can fetch even more than that.

## FIRST CAUSE OF ACTION
### (Non-dischargeability:  11 U.S.C. § 523(a)(2)(A) (Core))

81.     Plaintiff repeats, reiterates, and realleges each and every allegation and/or

statement set forth above, as if more fully set forth at length in this paragraph.

82.     Section 523(a) of the Bankruptcy Code states that

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or
> 1328(b) of this title does not discharge an individual debtor from
> any debt-- . . .
>
>> (2) "for money, property, [or] services . . . to the extent obtained by …
>> false pretenses, a false representation, or actual fraud . . . ."

83.     Robert Toone induced Kevin Steed to agree to shut down EAH by falsely stating

that Toone wished to shut down the company and move onto something else.  Robert Toone

failed to disclose that if Mr. Steed agreed to Toone's plea to shutter EAH, Toone planned to start

up the same company under a new name and continue the operations with his wife Stacy Toone.

84.     In reliance on Toone's representations and on his failure to disclose that in fact

Robert Toone intended to operate the same company, using the same suppliers and serving the

same customers, with his wife rather than with Mr. Steed, Mr. Steed agreed to the shutdown.

85.     Toone used his false and fraudulent representations and omissions to freeze Mr.

Steed out of EAH and steal the business under the pretense of shutting down the company, when

in fact Robert Toone was planning to, and did, resume EAH's business via a new LLC, which he

and Stacy Toone held out to the world as but a continuation of EAH by referring to the business

with customers, vendors, and even their bank as ProMobility "DBA Easy Access Homes."

86.     Robert Toone's conduct caused Mr. Steed severe injury.

87.     As a result of his conduct, Robert Toone is liable to Mr. Steed for damages in an

amount sufficient to compensate him for his one-half share of the property Toone

misappropriated from him, and for other relief, including equitable relief.

22

88.     Robert Toone's liability to Mr. Steed constitutes a debt "for money, property, [or]

services . . . to the extent obtained by … false pretenses, a false representation, or actual fraud . .

. ." within the meaning of 11 U.S.C. §523(a)(2)(A) and is not dischargeable.

## SECOND CAUSE OF ACTION
### (Non-dischargeability:  11 U.S.C. §523(a)(4) (Core))

89.     Plaintiff repeats, reiterates, and realleges each and every allegation and/or

statement set forth above, as if more fully set forth at length in this paragraph.

90.     Section 523(a) of the Bankruptcy Code states that

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or
> 1328(b) of this title does not discharge an individual debtor from
> any debt-- . . .
>
>> (4) "for fraud or defalcation while acting in a fiduciary capacity,
>> embezzlement, or larceny."

91.     Robert Toone was a fiduciary of Kevin Steed by virtue of the men's 50/50

partnership in EAH.

92.     As set forth above and also in the state law claims asserted below, Robert Toone

committed fraud and breaches of fiduciary duty when he induced Kevin Steed to agree to shut

down EAH by falsely stating that Toone wished to shut down the company and move onto

something else, when in fact Toone was instead planning to freeze Steed out of the partnership

and operate the same company, under a new name, with his wife Stacy Toone.

93.     Robert Toone was a fiduciary with respect to the specific funds taken in by him,

Stacy Toone, and/or ProMobility as payment for jobs awarded by the Department of Veterans

Affairs to EAH but completed by ProMobility (the "EAH Funds") after the purported shut down

of EAH.

94.     Robert Toone failed to provide Mr. Steed with his share of the EAH Funds. Instead of providing Mr. Steed with his 50% share, Robert Toone kept Mr. Steed's share for himself and used it for his purposes.

95.     Robert Toone and Stacy Toone effectively stole or converted, i.e., committed larceny with respect to, the EAH Funds, by taking possession of the EAH Funds but failing to provide Mr. Steed with his 50% share.

96.     Robert Toone and Stacy Toone knew that the EAH Funds were for jobs won by EAH, not by ProMobility.

97.     As a result of their conduct, Robert Toone and Stacy Toone are liable to Mr. Steed in the amount of his 50% partnership share of the EAH Funds.

98.     The Toones' liability to Mr. Steed constitutes a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" within the meaning of 11 U.S.C. § 523(a)(4) and is not dischargeable.

### THIRD CAUSE OF ACTION
### (Non-dischargeability:  11 U.S.C. § 523(a)(6) (Core))

99.     Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

100.    Section 523(a) of the Bankruptcy Code states that

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt-- . . .
>
>> (6) "for willful and malicious injury by the debtor to another entity or to the property of another entity."

101.    As detailed in the foregoing paragraphs and in the paragraphs below, Debtors inflicted deliberate or intentional injury on Mr. Steed without just cause or excuse, by, among other things, fraudulently inducing him to agree to shut down EAH in order to freeze him out so

as to be able to carry on the same business without him, misappropriating his share of the business and the corporate opportunities of EAH.

102.     Debtors' conduct caused Mr. Steed severe injury, for which Debtors are liable to Mr. Steed.

103.     The Toones' liability to Mr. Steed constitutes a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" within the meaning of 11 U.S.C. § 523(a)(6), and is not dischargeable.

## FOURTH CAUSE OF ACTION
### (Non-dischargeability:  11 U.S.C. § 727(a)(2)(A) (Core))

104.     Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

105.     Section 727(a) of the Bankruptcy Code states that "[t]he Court shall grant the debtor a discharge, unless—

> (2) the debtor, with intent to hinder, delay, or defraud a creditor . . .
> has transferred, removed, destroyed, mutilated, or concealed, or
> has permitted to be transferred, removed, destroyed, mutilated, or
> concealed—
>
> (A) property of the debtor, within one year before the date of the
> filing of the petition . . . ."

106.     Defendants voluntarily shut down and destroyed their thriving, if stolen, business, ProMobility, in October 2015, in the weeks leading up to this bankruptcy.  Among other things, Defendants stripped ProMobility of its substantial cash by draining its bank accounts and transferring its funds to themselves or third parties of their choosing.  Debtors have destroyed or hidden or transferred ProMobility's remaining inventory, and assets the existence and/or location of which remains unknown to Plaintiff.

107.    Defendants' intent in shutting down ProMobility and transferring, removing, and concealing its cash and other assets was to prevent Mr. Steed from collecting on what they knew would be a substantial liability to him in the State Court Action, a portion of which was required to be escrowed monthly under the Preliminary Injunction Order.  There was no legitimate reason to shut down a thriving business that took in more than $115,000 in credit card sales in October 2015 alone, and more than $550,000 in the first ten months of its operation.

108.    By shutting down and destroying their business and stripping it of its assets, the Toones also sought to create a purported, though fraudulent and bad faith, basis for claiming bankruptcy, through which the Toones intended to formally rid themselves of their debt to Mr. Steed.

109.    The Toones' actions render them ineligible for a discharge under Section 727(a)(2)(A) of the Bankruptcy Code.

### FIFTH CAUSE OF ACTION
**(Non-dischargeability:  11 U.S.C. § 727(a)(4) (Core))**

110.    Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

111.    Section 727(a) of the Bankruptcy Code states that "[t]he Court shall grant the debtor a discharge, unless—

> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> (A) made a false oath or account;
> (B) presented or used a false claim . . . ."

112.    A false statement or omission made by a debtor on his or her bankruptcy schedules or petition constitutes a false oath or statement under § 727(a)(4)(A).

26

113.    Debtors have made numerous, material false statements and material omissions on their bankruptcy petition and schedules, including but not limited to the false claims of debt, deliberate undervaluations, and material omissions detailed above.

114.    Debtors knew the statements were false when they made them, and knew they were omitting material information about their assets and income when they swore to the accuracy of the Petition.  When they were ordered by the Trustee to correct their errors and omissions, again, they failed to properly do so.

115.    Debtors' false statements and omissions are material to the course of their bankruptcy.  Had Debtors accurately portrayed in their Petition their assets and income during the 10 months preceding their bankruptcy filing, it would be obvious that they are not eligible for bankruptcy.

## SIXTH CAUSE OF ACTION
### (Breach of Contract Against Robert Toone) (non-core)

116.    Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

117.    Steed and Robert Toone are parties to the Partnership Agreement, as defined above.

118.    Robert Toone breached the Partnership Agreement, by, among other things (i) withdrawing from the partnership but continuing the business of the partnership without Steed, and without seeking a proper valuation of the business which would account for v the intangibles of goodwill and business relationships that Steed developed, that would have been included in the purchasing price of Steed's 50% partnership interest, in breach of paragraph 19 of the Partnership Agreement, and (ii) withdrawing from the partnership but failing to wind up the

affairs of EAH, liquidating assets of the partnership liquidated, paying its debts, and dividing the surplus equally with Steed, in breach of paragraph 24 of the Partnership Agreement.

119.    Plaintiff has fully performed his material obligations under the Partnership Agreement.

120.    Robert Toone's breaches of the Partnership Agreement have caused and are continuing to cause Plaintiff substantial injury.

121.    Plaintiff is entitled to specific performance of the Partnership Agreement, particularly of those provisions requiring his consent to manage EAH or any business continuing EAH, such as Defendant ProMobility; that Steed be paid 50% of the profits; and that Steed be bought out of his interest if Toone carries on the business of the partnership without him.

122.    Plaintiff will be irreparably harmed absent this equitable remedy and is without an adequate remedy at law.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Robert Toone) (non-core)

123.    Plaintiff repeats, reiterates and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

124.    As Plaintiff's partner in EAH under the Partnership Agreement, Robert Toone owed Plaintiff fiduciary duties.

125.    As one of two members of a member-managed limited liability company, Robert Toone owed fiduciary duties to Kevin Steed, his co-member, and to EAH.

126.    Robert Toone held all of EAH's assets and all the revenues generated by the Company in trust, and Toone breached that trust by diverting those assets and revenues to himself, to his wife Stacy Palmer-Toone, and to still unknown third parties.

127.    Robert Toone breached his fiduciary duties to Kevin Steed by misappropriating the business and assets of EAH and working in concert with his wife Stacy Toone to freeze Mr. Steed out of and take over the business without accounting to Plaintiff for his rightful (50%) share, or buying Plaintiff out as required by the Partnership Agreement.

128.    Robert Toone breached his fiduciary duties to EAH by misappropriating corporate opportunities that belonged to EAH, and taking them for defendant ProMobility, the company he and his wife used to carry on EAH's business without Plaintiff Steed.

### EIGHTH CAUSE OF ACTION
### (Fraud Against Robert Toone) (non-core)

129.    Plaintiff repeats, reiterates and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

130.    On November 29, 2014 and on other occasions during December 2014, Defendant Robert Toone told Plaintiff that he wished to shut down EAH.  Robert Toone stated that he wanted to shut down the company because he didn't think he and Steed could get along over the long haul; because the work was causing him too much stress; and because he wanted to pursue other work opportunities.  Toone told Steed that if EAH was shut down as he was pushing for, the Company's assets would be liquidated and he and Steed would divide up the assets in accordance with their respective (50/50) ownership interests.

131.    Robert Toone's statements to Steed about wanting to shut down EAH, pursuing other work opportunities, and liquidating and dividing up EAH's assets were false when he made them, and Toone knew they were false.  Rather than wanting to shut down the business, Toone was intending to continue operating the business with his wife and without Steed, drawing on the goodwill EAH had earned with its customers and vendors, and on the extensive marketing, sales,

accounting, and internet infrastructure Mr. Steed had developed for EAH virtually

singlehandedly.

132.    Toone made the false statements intending that Plaintiff would rely on them, to

induce Steed to agree to supposedly shut down EAH and walk away from the goodwill the

Company had generated, the value of the ongoing business from its customer base, and the

better-than market price structures that Steed had negotiated with vendors.

133.    Plaintiff relied on Toone's knowingly false statements concerning his wish to shut

down EAH, his intentions as to what he would do after EAH was shut down, and his promise

that once shut down, EAH would be liquidated and its assets divided between the two partners.

134.    Toone's fraud has caused Plaintiff substantial injury.

135.    Plaintiff is entitled to restitution and/or damages in an amount to be determined at

trial, plus punitive damages.

### NINTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty Against Stacy Toone)
### (non-core)

136.    Plaintiff repeats, reiterates and realleges each and every allegation and/or

statement set forth above, as if more fully set forth at length in this paragraph.

137.    Defendant Stacy Palmer Toone encouraged and helped Robert Toone to

misappropriate EAH's name, business, and goodwill to benefit themselves at Mr. Steed's

expense, and helped him accomplish Defendants' goal of doing so.

138.    Mrs. Toone's actions detailed above, including transferring the EAH website to a

new hosting company to which Plaintiff would not have access, setting up ProMobility to do

business as a continuation of EAH with vendors and the VA in December 2014 were carried out

for the purpose of taking over EAH and operating the business without Steed.  Stacy Toone

identified herself as a members of ProMobility in state business filings, and she and her husband

falsely stated in those filings that ProMobility was "DBA Easy Access Homes," thereby falsely

conveying to the VA and EAH's suppliers that the business they were running was but a

continuation of EAH.

139.    The wrongful conduct of Stacy Palmer Toone caused Plaintiff substantial injury

for which she is liable to Plaintiff.

140.    Plaintiff is entitled to restitution and/or damages in an amount to be determined at

trial, plus punitive damages.

### TENTH CAUSE OF ACTION
### (Tortious Interference With Contract Against Stacy Toone) (non-core)

141.    Plaintiff repeats, reiterates, and realleges each and every allegation and/or

statement set forth above, as if more fully set forth at length in this paragraph.

142.    Plaintiff is a party to the Partnership Agreement, which constitutes a contract

between Mr. Steed and Robert Toone.

143.    At all relevant times, defendant Stacy Palmer-Toone was aware of the terms of

the Partnership Agreement, including its provisions concerning the management of the business

of the partnership and the withdrawal and buyout of a partner.

144.    Stacy Palmer-Toone, without justification, out of malice or solely to advance her

own interests and enrich herself at the expense of Plaintiff Steed, caused or induced Defendant

Robert Toone to breach the Partnership Agreement by causing Toone to freeze out Steed and

operate the business of EAH without Steed; to incur substantial obligations without Steed's

consent; and to withdraw from the partnership without buying Steed out, all in violation of the

express terms of the Partnership Agreement.

145.    The wrongful conduct of Stacy Palmer Toone has caused Plaintiff substantial injury for which she is liable.

146.    Plaintiff is entitled to restitution and/or damages in an amount to be determined at trial, plus punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Conversion Against All Defendants) (non-core)

147.    Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph

148.    Defendants have taken possession of the assets, intellectual property, goodwill, customer relationships, revenue, and income of EAH, and of Plaintiff's share of the foregoing, and converted these assets and income to their own use, for their benefit and in derogation of Plaintiff's rights and ownership.

149.    Defendants' acts were willful, malicious and oppressive, and were taken with the intent to injure Plaintiff.  As a result, Plaintiff is entitled to an award of punitive damages in addition to the return of his property.

## TWELFTH CAUSE OF ACTION
### (For an Attachment, Pursuant to N.J. Ct. Rule 4:60-5 N.J.S.A. 2:26-2 Against All Defendants) (non-core)

150.    Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

151.    Based on the facts set forth above, it is probable that final judgment in this action will be rendered in Plaintiff's favor on some or all of their claims.  The Partnership Agreement unambiguously identifies Plaintiff as a 50% owner of EAH, and provides that when one partner continues the business without the other the partner continuing the business must buy out the other partner.  Defendants cannot dispute that Robert Toone, in concert with Stacy Toone, has

continued the business of EAH without buying Mr. Steed out, and has thereby breached the

Partnership Agreement.

152.    Defendants also will be unable to refute that they have committed and are

committing fraud.  Rob lied to Kevin to induce him to give up the business; sent emails to

vendors and customers, including to the VA, in telling them the business was shutting down; and

virtually simultaneously—sometimes in the same email—told the VA and EAH's suppliers that

he would be continuing in the same business and that he would be the sole contact, to ensure that

these businesses did not contact Kevin and thereby make Kevin aware of what Rob had done..

153.    Both defendants are New Jersey residents and have property to attach in the state.

154.    The statutory grounds for attachment are satisfied in that (i) Plaintiff has claims of

an equitable nature as to which a money judgment, among other forms of relief, is demanded; (ii)

Plaintiff is the equitable owner of exactly the funds to be attached, as the funds sought to be

attached consist of  Steed's 50% of the profits earned by EAH, in other words, Plaintiff seeks to

attach principally the specific property that actually belongs to him; and (iii) Plaintiff would be

entitled to "an order of arrest before judgment," N.J.S.A. 2A:26-2(a), in that Defendants have

property that they are fraudulently concealing from Plaintiff, see N.J.S.A. 2A:15-42, namely,

business revenues that belong to Plaintiff Steed.  In the alternative, Plaintiff seeks to attach

substitute property up to the value of Defendants' debt to Plaintiff.

155.    Plaintiff will suffer irreparable harm absent this equitable statutory remedy and

lacks an adequate remedy at law.

### THIRTEENTH CAUSE OF ACTION
### (For Constructive Trust and Disgorgement Against All Defendants) (non-core)

156.    Plaintiff repeats, reiterates and realleges each and every allegation and/or

statement set forth above, as if more fully set forth at length in this paragraph.

157.    EAH is the owner of the profits generated the business activities carried out under its name or by any entity continuing its business.

158.    As set forth above, Defendants have misappropriated 100% of those profits by diverting them to themselves and to ProMobility.

159.    Plaintiff Kevin Steed is an owner and thus has an equitable interest in 50% of the profits of EAH and any entity continuing the business of EAH, such as Defendant ProMobility.

160.    As set forth above, Defendants have misappropriated that interest and such profits.

161.    Accordingly, the Court should impose a constructive trust over (i) 100% of the profits generated by any entity continuing the business of EAH, such as defendant ProMobility, and (ii) Mr. Steed's 50% interest in EAH and any entity continuing the business of EAH, such as ProMobility, or other derivative business including the Toones' latest business, Gen2 Contracting.

162.    Upon the creation of such a constructive trust, Defendants should be required to disgorge those misappropriated assets to Plaintiff.

163.    Plaintiff will suffer irreparable harm absent these equitable remedies and lacks an adequate remedy at law.

## FOURTEENTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against Defendant Stacy Toone) (non-core)

164.    Plaintiff repeats, reiterates, and realleges each and every allegation and/or statement set forth above, as if more fully set forth at length in this paragraph.

165.    On November 29, 2014, and on other occasions during December 2014, Defendant Robert Toone told Plaintiff that he wished to shut down EAH.  Robert Toone stated that he wanted to shut down the company because he didn't think he and Steed could get along

over the long haul; because the work was causing him too much stress; and because he wanted to pursue other work opportunities.  Toone told Steed that if EAH was shut down as he was pushing for, the Company's assets would be liquidated and he and Steed would divide up the assets in accordance with their respective (50/50) ownership interests.

166.    Robert Toone's statements to Steed about wanting to shut down EAH, pursuing other work opportunities, and liquidating and dividing up EAH's assets were false when he made them, and Toone knew they were false.  Rather than wanting to shut down the business, Toone was intending to continue operating the business with his wife and father but without Steed, drawing on the goodwill EAH had earned with its customers and vendors, and on the extensive marketing, sales, accounting, and internet infrastructure Steed had developed for EAH virtually singlehandedly.

167.    Toone made the false statements intending that Plaintiff Steed would rely on them, to induce Steed to agree to supposedly shut down EAH.

168.    Steed relied on Toone's knowingly false statements concerning the latter's wish to shut down EAH, intentions as to what he would do after EAH was shut down, and promise that once shut down, EAH would be liquidated and its assets divided between the two partners.

169.    Toone's fraud has caused Steed substantial injury.

170.    At all relevant times Stacey Toone was aware of Robert Toone's fraudulent conduct and provided substantial assistance to him, without which the fraud could not have occurred.

171.    Specifically, Stacy Toone conferred with Robert Toone and encouraged him to make the representations and non-disclosures that he did to Kevin Steed with the intention that Mr. Steed rely on them to his detriment, and provided substantial assistance in setting up the

accounts and structures through which ProMobility carried on EAH's business and held itself out as a continuation of EAH.

172.    Stacy Toone is liable for her misconduct.

173.    Steed is entitled to restitution and/or damages in an amount to be determined at trial, plus punitive damages.

**WHEREFORE**, plaintiff requests judgment in his favor and against defendants as follows:

A.    On the First, Second, and Third Causes of Action, a declaratory judgment that Defendants are liable to Plaintiff for the wrongs asserted in those causes of action, and that those debts are non-dischargeable, as provided in Bankruptcy Code §§ 523(a)(2), (a)(4), and (a)(6);

B.    On the Fourth and Fifth Causes of Action, a declaratory judgment that Defendants are not entitled to a discharge in this case, as provided in Bankruptcy Code §§ 727(a)(2) and (a)(4);

C.    On the Sixth Cause of Action:

1.    Specific performance of the Partnership Agreement as noted above;

2.    A preliminary and permanent injunction prohibiting Robert Toone from further breaching the Partnership Agreement;

3.    Disgorgement of and imposition of a constructive trust covering all funds belonging to EAH and to Plaintiff Steed based on his 50% ownership of EAH;

4.    Restitution and/or damages sufficient to compensate Mr. Steed for Robert Toone's breaches of the Partnership Agreement;

5.    Punitive damages;

D.    On the Seventh and Eighth Causes of Action,

1. Disgorgement of and imposition of a constructive trust covering all funds belonging to EAH and to Plaintiff based on his 50% ownership of EAH;

2. Restitution and/or damages sufficient to compensate Plaintiff for Robert Toone's misappropriation of (i) EAH's income and other property and assets belonging to EAH, and (ii) Steed's 50% share of the profits and assets of EAH;

3. Punitive damages;

4. An attachment of 50% of the net profits of ProMobility and/or any other person or entity through whom defendants are conducting the business of EAH;

E. On the Ninth, Tenth, Eleventh, and Fourteenth Causes of Action:

1. Disgorgement of and imposition of a constructive trust covering all funds belonging to EAH and to Plaintiff Steed based on his 50% ownership of EAH;

2. Restitution and/or compensatory damages sufficient to compensate Steed for the injury caused by the wrongful conduct of Stacy Palmer-Toone;

3. Punitive damages;

F. On the Twelfth Cause of Action:

1. Appointment of an independent accountant or monitor to assist in (a) preparing an accounting of all partnership funds and income lost, foregone, or assets depleted as a result of Defendants' misconduct, and (b) in determining the amount of net profits belonging to EAH and to Steed that defendants have diverted to and stolen for themselves, and an order directing (i) preparation of

such an accounting, and (ii) determination of the net profits owed to EAH and to Steed, since at least November 29, 2014 and on an ongoing basis;

2. Disgorgement of and imposition of a constructive trust covering all funds belonging to EAH and to Plaintiff Steed based on his 50% ownership of EAH;

3. Restitution and/or damages sufficient to compensate plaintiff for Defendants' misappropriation of plaintiff's income and profits and other property and assets belonging to plaintiff;

4. An attachment of 50% of the net profits of ProMobility and/or any other person or entity through whom Defendants are conducting the business of EAH, as determined by the independent accountant or monitor whom Plaintiffs are requesting be appointed as set forth above;

G.    On the Thirteenth Cause of Action:

1. Disgorgement of and imposition of a constructive trust covering all funds belonging to Plaintiff based on his 50% ownership of EAH;

H.    On all non-core causes of action:

1. A preliminary and permanent injunction prohibiting Robert Toone from destroying or transferring the assets, and dissipating the revenues, of EAH or any other entity or person carrying on the business of EAH;

2. Punitive damages;

I.    On all causes of action:

1. The reasonable attorneys' fees and costs incurred in prosecuting this action; and pre and post-judgment interest on any amounts awarded; and

2. Such additional relief as the Court may deem fair and proper.

Dated:  February 8, 2016        ORLOFF, LOWENBACH, STIFELMAN
        & SIEGEL, P.A.
        Attorneys for Plaintiffs


By:__/s/ David Gorvitz_____
    DAVID GORVITZ

*-and-*

SCHLAM STONE & DOLAN LLP
Attorneys for Plaintiff
ELIZABETH WOLSTEIN (admitted *pro hac vice*)
LYNDON M. TRETTER (admitted *pro hac vice*)