**NOT FOR PUBLICATION**

```
FILED
JAMES J. WALDRON, CLERK
OCT. 17, 2016
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: s/ Ronnie Plasner
JUDICIAL ASSISTANT
```

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

In Re:

**ROBERT L. TOONE and
STACY-ANN E. TOONE,**

                Debtors.

Case No.: 15-30535 (JKS)

Judge:   Hon. John K. Sherwood

**OPINION REGARDING MOTION TO DISMISS
PURSUANT TO § 707 OF THE BANKRUPTCY CODE**

**APPEARANCES**

**ANDREW T. SHAW, ESQ.**
301 Dover-Chester Rd.
Randolph, New Jersey 07869
*Counsel for Debtors*

**ORLOFF, LOWENBACH, STIFELMAN & SIEGAL, PA**
David Gorvitz, Esq.
101 Eisenhower Parkway
Suite 400
Roseland, New Jersey 07068-1097
*Co-Counsel for Creditor/Movant Kevin Steed*

**STONE & DOLAN LLP**
Elizabeth Wolstein, Esq.
26 Broadway
New York, New York 10004
*Co-Counsel for Creditor/Movant Kevin Steed*

**HONORABLE JOHN K. SHERWOOD, BANKRUPTCY JUDGE**

Kevin Steed ("Steed"), a former business partner of Robert L. Toone ("Toone") and Stacy-Ann E. Toone (collectively, the "Debtors"), has moved for dismissal of this bankruptcy case pursuant to 11 U.S.C. §§ 707(a) and (b).  Steed claims that the Debtors sought bankruptcy protection solely to frustrate litigation pending in the Superior Court of New Jersey, Chancery Division, Morris County ("State Court") and that they have made several misrepresentations and omissions in their petition and schedules. The Debtors allege that they were forced to seek bankruptcy protection because they were without the financial resources to operate their business while defending the State Court action.  They also claim that the inaccuracies in their filings with the Court were unintentional.  At the hearing on Steed's motion, the Court offered the parties an opportunity to provide live testimony and conduct cross-examination.  Both Steed and the Debtors declined.  Thus, the Court's factual findings are based on the certifications of the parties and accompanying exhibits.  For the reasons set forth below, the Court will deny Steed's motion.

## JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984, as amended September 18, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FACTUAL BACKGROUND

The Debtors are a married couple residing in Lake Hopatcong, New Jersey.  Toone worked in various management roles over a period of 15 years before transitioning to the medical services industry.  As an employee of a medical supply company, he installed and

3

serviced ramps, lifts and other accessibility products for physically disabled customers. He developed various contacts with suppliers and customers, including the Department of Veterans Affairs ("VA").[1]

In November 2012, the Debtors began to discuss the possibility of opening their own business. With Toone's contacts in the industry and at the VA, the Debtors believed it made sense to open a mobile accessibility company, where the capital required and the overhead costs would be low.[2] Steed was a neighbor and friend of Toone and offered his assistance to help get the company off the ground. Steed researched the industry and customer demographics, evaluated business models and projected the financial aspects of the startup. He felt the business could be successful and decided to partner with the Debtors.[3]

The parties established Easy Access Homes ("EAH"), purchased a domain name, obtained insurance for the business and created a logo.[4] Mrs. Toone and Steed executed a certification of formation for EAH as a limited liability company in the State of New Jersey on June 7, 2013.[5] Two weeks later, on June 21, 2013, a general partnership agreement was executed by Toone and Steed.[6] The Debtors state that it was always intended that Mrs. Toone would hold their interest in the business and the partnership agreement which was drafted by Steed was inconsistent with this understanding.[7]

The parties' accounts of their early contributions and commitment to EAH are very different. According to Steed, while he was working tirelessly to set up the company's infrastructure, establishing relations with vendors and pursuing new business with the VA,

---

[1] Sworn Mediation Statement attached to Certification of Robert L. Toone in Opposition to Motion to Dismiss ("R. Toone Cert.") [ECF 59], Pg. 1.
[2] *Id.* at Pg. 2.
[3] Declaration of Elizabeth Wolstein in Support of Motion to Dismiss ("Wolstein Decl.") [ECF 47], Ex. A, ¶¶ 11-19.
[4] R. Toone Cert., Pg. 2.
[5] *Id.* at Ex. 4.
[6] *Id.* at Ex. 7.
[7] *Id.* at Pg. 9-10.

4

Toone was "playing with his son, and walking their dog."[8] Toone, on the other hand, says that in the summer of 2013, he resigned from his job to focus his full attention on EAH while Steed was becoming hostile and removing himself from the business. And, that in December 2013, Steed informed him that he had accepted a full-time position with a bank in New York City, where he was working 60-80 hours per week. Because Steed's wife also worked in New York, he decided to move there and only return to New Jersey on the weekends.[9]

Nevertheless, after a slow start (EAH recorded revenue of $16,973 and a loss of $1,823 in 2013),[10] business improved. In the summer of 2014, Toone and Steed met with an individual at the Castle Point VA hospital in Wappinger Falls, New York. EAH was subsequently notified that it had been approved as a vendor and was qualified to submit bids for jobs at seven VA medical centers. In July 2014, EAH was awarded its first VA contract and saw a corresponding increase in the number of bid requests. Many of the bids proved successful and EAH handled a large number of projects with contracts that were valued at anywhere from $3,000 to $15,000. According to Steed, the result was a 35-65% profit margin for EAH and the company was on track for $500,000 in revenue from the East Orange, New Jersey VA location alone.[11]

By September or October of 2014, Toone claims that his family's financial reserves were exhausted and he needed a regular paycheck. Toone and Steed agreed to provide him with a base salary of $500 per week.[12] Though the business was growing in 2014, there was tension in the relationship between the Debtors and Steed. According to the Debtors, Steed was consumed with his bank position in New York and his communications with them were confined to text messages and an occasional meeting on the weekend. In contrast, Toone claims he worked 45-

---

[8] Wolstein Decl., Ex. A, ¶¶ 23-49.
[9] R. Toone Cert., Pg. 4.
[10] *Id.* at Ex. 18.
[11] Wolstein Decl., Ex. A, ¶¶ 35-39.
[12] R. Toone Cert., Pg. 5.

70 hours a week solely for EAH and was dealing with all vendors, customers, installations and repairs. When Toone sought additional labor assistance from acquaintances, Steed objected and suggested that day laborers be used to complete work. In conjunction with a planned business trip to Ohio, Toone and Steed initially decided that Toone would drive to Ohio, pick up inventory and drive back to New Jersey in one day. After discussing this with his wife, it was apparent to Toone that the plan was not feasible because of the time and distance involved. This change of plans greatly upset Steed and Toone felt that their business relationship was becoming strained.[13]

On November 17, 2014, Steed sent an email to Toone with decisions he had made regarding, among other things, Toone's use of the company vehicle to drive his children to school and the termination of his $500 weekly salary.[14] Toone and Steed discussed the email via telephone and specifically Steed's unilateral decision to end Toone's salary. During this conversation, Toone claims that Steed said: "I started it, I'm shutting it down" and if Toone did not agree, he could "get a job like I did or we can dissolve the company."[15]

Feeling that Toone was being treated as an employee, not an equal, and without a weekly paycheck, the Debtors decided to end the partnership with Steed. On November 29, 2014, Toone emailed Steed and advised that he and Steed had too many differences, the issues were insurmountable and that he would terminate the partnership.[16] Steed attempted to persuade Toone to change his mind, but was unsuccessful.[17] Toone expressed hope that the dissolution would be amicable.[18]

---

[13] *Id.* at Pg. 5-7.
[14] *Id.* at Pg. 7 and Ex. 13.
[15] *Id.* at Pg. 8.
[16] *Id.* at Pg. 9 and Ex. 21.
[17] Wolstein Decl., Ex. A, ¶¶ 50-51.
[18] R. Toone Cert., Ex. 21.

6

Toone and Steed worked together to wind up the business. They agreed to finish certain jobs, liquidate assets and pay their vendors. Toone agreed to rent storage space and list remaining inventory for sale, with both parties splitting the proceeds.[19] Generally, the wind down of EAH, which began in December 2014, seemed amicable. During the process, Toone does not recall that Steed ever inquired into his plans post-dissolution.[20] Unbeknownst to Steed, and as Toone acknowledges, the Debtors were planning to open their own installation business while EAH was being shut down. They cite the lack of a covenant not to compete in the partnership agreement as justification for this course of action.[21]

In mid-December 2014, the Debtors opened ProMobility, LLC ("ProMobility")[22] and within a year it had $117,490 in credit card sales.[23] The Debtors' creation of ProMobility, and the fact that it engaged in virtually the same business as EAH, led Steed to believe the Debtors and Richard Toone (Mr. Toone's father) had conspired to run a business based on his good will, hard work and customer relationships. Steed felt they had stolen a business he planned, launched, nurtured and ultimately made successful.[24]

On July 21, 2015 Steed filed a State Court show cause action against the Debtors and ProMobility for an attachment, preliminary injunction and related relief.[25] On September 16, 2015 the State Court issued an Order requiring: (i) the monthly escrow of 10% of ProMobility's revenues by the tenth of the following month; and (ii) the submission of an accompanying report detailing ProMobility's monthly revenue and expenses.[26]

---

[19] *Id.* at Ex. 22.
[20] *Id.* at Pg. 14.
[21] Declaration of Stacy-Ann E. Toone in Opposition to Motion to Dismiss ("S. Toone Decl.") [ECF 50], ¶ 7.
[22] Wolstein Decl., Ex. L.
[23] *Id.* at Ex. M.
[24] *Id.* at Ex. A, ¶ 69.
[25] *Id. at* ¶ 6.
[26] *Id.* at Ex. B.

ProMobility and the Debtors tendered a partial escrow payment to Steed on October 9, 2015 and the accompanying financial report on October 12, 2015.[27] Shortly thereafter, the Debtors claim that they could not afford to continue operation of the business while defending against Steed's lawsuit and they ceased operations.[28] On October 30, 2015, the Debtors filed this Chapter 7 bankruptcy case.

On December 10, 2015, Steed and his attorney appeared at the Debtors' § 341(a) meeting of creditors, where they learned for the first time that the Debtors had ceased operation of ProMobility.[29] On February 4, 2016, Steed's attorney conducted a Rule 2004 examination of the Debtors. During this examination, Steed learned that the Debtors had made omissions and misrepresentations in their sworn statements filed with the Bankruptcy Court concerning their monthly expenses, income and assets.[30]

On February 8, 2016, Steed filed an adversary action in this Court seeking a judgment of non-dischargeability pursuant to 11 U.S.C. §§ 523(a) and to deny the Debtors their discharge under § 727(a) of the Bankruptcy Code. Steed filed this motion to dismiss the Debtors' bankruptcy case on May 3, 2016,[31] and the Debtors filed opposition.[32] The Debtors' Chapter 7 Trustee has taken no position on the motion to dismiss.

## DISCUSSION

**STEED HAS NOT DEMONSTRATED THAT THE BANKRUPTCY CASE SHOULD BE DISMISSED FOR BAD FAITH OR ABUSE PURSUANT TO 11 U.S.C. §§ 707 (a) OR (b).**

Steed moves for dismissal of this Chapter 7 bankruptcy case under both 11 U.S.C. §§ 707(a) and (b). The Third Circuit has described subsection (a) as governing the dismissal of

---

[27] *Id.* at. ¶ 8.
[28] S. Toone Decl., ¶ 11.
[29] Wolstein Decl., ¶ 14.
[30] Steed Memorandum of Law in Support of Motion to Dismiss ("Steed Memo. of Law") [ECF 47], Pg. 10-15.
[31] [ECF 47].
[32] [ECF 50].

8

all bankruptcy filings when adequate "cause" has been shown, while subsection (b) governs the dismissal of those bankruptcy filings involving primarily consumer debts, when granting relief would be an "abuse" of Chapter 7. *Perlin v. Hitachi Capital America Corp.,* 497 F.3d 364, 369 (3d Cir. 2007). Section 707(a) provides that a court "may dismiss a case under this chapter only after notice and a hearing and only for cause" and lists three non-exclusive examples of "cause" which would warrant dismissal. The Third Circuit has found that the "lack of good faith" in filing for bankruptcy protection is proper cause for dismissal under § 707(a). *Perlin,* 497 F.3d at 369. At the very least, "good faith requires a showing of honest intention." *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).

       The burden of proof is on the moving party to establish bad faith by a preponderance of the evidence. *In re Horan,* 304 B.R. 42, 48 (Bankr. D. Conn. 2004). After bad faith is established, the burden then shifts to the petitioner to prove good faith. *Tamecki*, 229 F.3d at 207. The court has discretion to determine whether good faith is present on an "ad hoc basis" and must decide whether the filing party has "abused the provisions, purpose, or spirit of bankruptcy law." *Id.* (citing *In re Marks,* 174 B.R. 37, 40 (E.D. Pa. 1994)). Any inquiry "requires consideration of all the facts and circumstances surrounding the debtor's filing for bankruptcy," *Perlin,* 497 F.3d at 372, and should focus "*on the debtor* and particularly [their] intent ("good" or "bad" faith) in filing." *Office of the United States Trustee v. Mottilla*, 306 B.R. 782, 788 (Bankr. M.D. Pa. 2004) (emphasis in original). Dismissal "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud, misconduct or gross negligence." *Tamecki*, 229 F.3d at 207.

Section § 707(b) provides that the court may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, "if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), the court is instructed to consider whether the case was filed in bad faith or whether the totality of the circumstances of the debtor's financial situation demonstrates abuse. *In re Cardona-Pereira*, 2010 WL 500404, at *2 (D.N.J. Feb. 4, 2010) (citing *In re Naut*, 2008 WL 191297, at *3 (Bankr. E.D. Pa. 2008).

The factors considered under the bad faith and totality of circumstances tests mirror each other. When assessing bad faith under § 707(b)(3)(A), "courts consider factors similar to those considered under § 707(b)(3)(B), but focus on factors such as the circumstances that precipitated the debtor's filing for bankruptcy, the debtor's intentions in filing for bankruptcy, and whether the debtor has honestly disclosed his financial condition." *In re Citta,* 2012 WL 6624690, at *3-4. (D.N.J. Dec. 19, 2012) (quoting *In re Hilmes*, 438 B.R. 897, 911-912 (N.D.Tex. 2010). The focus is "*on the purpose of Chapter 7 relief under the Bankruptcy Code,* primarily the issue of whether the petitioner is the honest and needy consumer debtor the Code was intended to protect." *Mottilla*, 306 B.R. at 788 (emphasis in original).

Thus, when considering a motion to dismiss under §§ 707 (a) and (b), the court must first undertake a subjective analysis of whether the case was filed in bad faith or whether the filing would be an abuse of the provisions of Chapter 7.

**1.    Steed Has Not Demonstrated By A Preponderance Of The Evidence That The Debtors' Bankruptcy Filing Constitutes Abuse Or Bad Faith.**

Steed alleges that the Debtors engaged in bad faith and abused the provisions of bankruptcy law because ProMobility was profitable and they filed for bankruptcy protection in

10

an effort to frustrate the State Court litigation. Steed further contends that the Debtors shut down ProMobility, a successful business, for the sole purpose of qualifying for bankruptcy protection.

In response to Steed's claim that they lacked good faith in filing, the Debtors argue that they had no choice but to file for bankruptcy protection as the State Court action made it impossible to run the company and pay their bills.[33] At the time of filing, the Debtors were behind on their monthly mortgage payments.[34] In 2015, Mrs. Toone was forced to take draws from ProMobility "when [the Debtors] needed to pay bills or when [her] salary wouldn't cut it."[35] The State Court injunction ended the Debtors' ability to take draws and directed that 10% of gross revenue be set aside for Steed. The Debtors concluded that it made more sense to shut down ProMobility than to run it without being able to draw profits for their monthly living expenses. With a mortgage and three children to support, the Debtors claim that they did not have the resources to engage in litigation with Steed over the existence of ProMobility. In the context of this motion to dismiss, which is being decided on the papers with the consent of the parties, the Court cannot disregard or discount the Debtors' explanations.

Steed points to dwindling revenue after the State Court action began, with a substantial increase just before filing, as evidence of malicious intent by the Debtors to dissipate the funds of a successful business and qualify for bankruptcy protection.[36] The Debtors claim that procedural changes by the VA caused artificially low numbers in the months leading up to their bankruptcy filing (August and September) and that closing ProMobility caused artificially high numbers for October 2015, when revenue jumped to $117,490.[37] Finally, the Debtors acknowledge that ProMobility had $556,264 in gross sales from December 2014 to October

---

[33] S. Toone Decl., ¶ 11.
[34] R. Toone Cert., Pg. 16. (*see also* Motion for Relief from Stay filed by JPMorgan Chase Bank [ECF 31]).
[35] Wolstein Decl., Ex. N (7:9 – 7:11).
[36] Affidavit of Kevin Steed in Support of Motion to Dismiss ("Steed Aff'd."), [ECF 47], ¶ 10.
[37] S. Toone Decl., ¶ 12.

11

2015, but emphasize that their net profit was only $56,914.[38] Due to the State Court litigation, this profit would be eroded by legal fees and monthly escrows for the benefit of Steed.

Steed will have another opportunity to challenge the Debtors' motives in his pending adversary proceeding which seeks to deny the Debtors' discharge and obtain judgment that his claim against them is non-dischargeable.

## 2. The Debtors' Misrepresentations And Non-Disclosure Do Not Warrant Dismissal At This Time.

Steed alleges that the Debtors' bankruptcy filings contain various misrepresentations and omissions that were made deliberately to hide the fact that they are not in need of bankruptcy protection. A summary of those alleged errors and omissions, together with responses of the Debtors, is set forth in the chart below:

| STEED ALLEGATION | DEBTOR RESPONSE/ACTION |
|---|---|
| The Debtors failed to disclose draws Stacy Toone took from ProMobility as income in 2015. | Mrs. Toone claims she didn't include the draws as income in the initial Schedule I because she was asked for pay stubs for the 6 months prior to bankruptcy and she did not believe that draws qualified. *(S. Toone Cert., ¶ 17)*. The Debtors' initial Schedule I indicated their gross income was $9,025. Their amended form 22A-1 filed March 8, 2016 shows income as $10,271.50, which apparently includes the draws from ProMobility. |
| The Debtors included unpaid invoices owed EAH's accountant as a liability. | Since EAH is closed, the Debtors were concerned that they may be personally liable for the debt. |
| The Debtors reported their U-Stor-It storage bill as a liability even though ProMobility paid it. | Since ProMobility is closed, the Debtors were concerned that they may be personally liable for the debt. *(S. Toone Cert., ¶ 11)*. |
| The Debtors reported their cellular bill as a monthly expense, even though ProMobility paid it. | Since ProMobility is closed, the Debtors believed that they would be personally liable for the expense going forward. *(S. Toone Cert., ¶ 11)*. |
| The Debtors failed to include tuition assistance received from a family friend as income in Schedule I. | The Debtors acknowledge Mrs. Toone's mother pays for their son's school tuition. *(S. Toone Cert., ¶ 16)*. |
| The Debtors fraudulently transferred title to EAH's vehicle and did not report the vehicle as an asset. | The Debtors initially offered Steed the ability to purchase half of the vehicle. The Debtors had been paying the storage costs for the truck and remaining inventory since EAH was closed, but could no longer afford to do so. They gave the unsigned title and Steed's contact information to the owner of the facility. *(S. Toone Decl., ¶ 13)*. |
| The Debtors list the value of their home at $289,000, even though the Ch. 7 Trustee valued it at $317,000. | The Debtors claim that the house valuation is accurate and the Ch. 7 Trustee has abandoned the property. Additionally, the Debtors' amended Schedule A/B lists the property value at $321,000. *[ECF 40]*. |

---

[38] Certification of Stacy-Ann E. Toone in Opposition to Motion to Dismiss ("S. Toone Cert."), [ECF 59], ¶ 12 and Ex. C.

| | |
|---|---|
| The Debtors list the value of their 401k and IRA as unknown, even though December 2015 IRA statement shows a balance of $975. | ***NOT ADDRESSED*** |
| The Debtors failed to disclose two 529 education accounts as assets, one of which was valued at $7,000 in December 2015. | ***NOT ADDRESSED*** |
| The Debtors failed to disclose Stacy Toone's engagement ring as an asset. | ***NOT ADDRESSED*** |
| The Debtors claim they don't own household electronic equipment, even though they own 4 televisions. | The four televisions are antique (not flat-screen) and their furnishings are basic in nature. *(Debtors' Memorandum of Law in Opposition to Motion to Dismiss ("Debtors' Memo. of Law in Opposition"), [ECF50], Pg. 2).* |
| The Debtors value their interest in ProMobility at $100, even though the company owns a 2015 Ford Transit valued at $14,500. | The truck loan is more than the value of the vehicle (which the Ch. 7 Trustee abandoned) and the company is closed. *(S. Toone Cert., ¶¶ 8 and 13).* |
| The Debtors fail to disclose Stacy Toone's salary from Restoration 1 as income. | The Debtors claim that the salary has been accounted for and the Ch. 7 Trustee reviewed the pay stubs. *(Debtors' Memo. of Law in Opposition, Pg. 2).* |

Steed argues that the Debtors have been afforded every opportunity to correct these mistakes on their schedules, statement of financial affairs, and 22A-1 Form (Statement of Your Current Monthly Income), but have purposefully not done so. As the chart demonstrates, the Debtors have provided what appear to be rational responses to many, but not all, of Steed's allegations.

Schedule B directs a petitioner to disclose jewelry and 529 education accounts, while Schedule I requests disclosure of regular family support payments. In their filings with the Court (including amendments), the Debtors disregarded this clear directive and have failed to disclose an engagement ring, 529 education account, IRA account, tools, and tuition assistance received from a family member.[39]

Steed directs the Court's attention to cases that support dismissal when a petitioner has filed misleading or fraudulent financial information. He cites *In re Belanger*, 524 B.R. 634

---
[39] Wolstein Decl., Ex. N (31:10 – 32:4), W, and V.

13

(Bankr. E.D. Pa. 2015) where joint debtors failed to accurately disclose income and expenses. In circumstances similar to those here, the debtors in *Belanger* amended schedules on two separate occasions, yet failed to provide an accurate picture of their finances. In discussing the failure of the debtors to fully disclose, the court, "although possessed of a healthy skepticism," stopped short of dismissal solely due to error or omission because the debtors "had explanations, albeit thin, as to some of the omissions or errors in disclosures" and they could "possibly be attributed to mistake, misunderstanding or inadvertence." *Id.* While the court was willing to overlook the omissions, it ultimately dismissed the case because it was "not so much in the missteps, but rather in what they prove." *Id.* at 641. After reviewing the proper financials involved, the *Belanger* court found that the debtors' monthly net surplus income rose from $3,080 to $7,645 and they would easily be able to pay all creditors in full over a period of 60 months. *Id.* at 642.

Steed also relies on *In re Hoffman*, 413 B.R. 191 (Bankr. M.D. Pa. 2008), where the debtor failed to disclose various assets, including tools and toolboxes. While Steed suggests that the debtor's failure to disclose tools led to dismissal, it does not appear that this was a major basis for the Court's decision. Instead, the *Hoffman* court, in dismissing the case, focused its attention on the debtor's monthly income, which was understated by almost $400, and the fact that his monthly housing expense deduction was $1,355 more than the standard IRS deduction of $983 per month. *Id.* at 197. Thus, both *Belanger* and *Hoffman* support this Court's view that fraudulent intent and materiality must be fully explored in the context of a motion to dismiss under §§ 707(a) and (b) of the Bankruptcy Code.

The Debtors admit they have made mistakes in reporting both income and expenses[40] and understand that they did not review the petition "as closely as [they] should have."[41] While the

---

[40] S. Toone Cert., ¶ 7.
[41] Wolstein Decl., Ex. N (48:7-8).

Debtors have failed to completely disclose their financial condition, the Court cannot conclude, based on the record, that this was a fraudulent attempt to conceal assets, as opposed to carelessness or indifference. Again, Steed can fully explore the Debtors' motives for non-disclosure (and the materiality of same) in his pending adversary proceeding, which seeks relief under §§ 523 and 727 of the Bankruptcy Code.

But the Court cannot overlook the fact that the Debtors failed to amend their disclosures when questions were raised by Steed at the 2004 examination and did not fully address these concerns in their opposition to the motion to dismiss. Full disclosure is critical in bankruptcy cases. The Debtors cannot obtain a discharge, the protection of the automatic stay or a "fresh start" unless and until they <u>fully</u> disclose their assets, liabilities and financial affairs. This is a basic bankruptcy principle and the Debtors cannot ignore it without consequence. Thus, although the case will not be dismissed at this time based on the Debtors' lack of disclosure, the Court will enter an Order to Show Cause scheduling a hearing to consider: (i) dismissal of the case if complete and accurate schedules and statements of financial affairs are not filed within 20 days; and (ii) whether the Debtors or their counsel should be sanctioned for the omissions and/or misrepresentations raised by Steed.

3. **The Court Reserves Decision On The Presumption Of Abuse Under The Means Test (11 U.S.C. § 707(b)(2)).**

While the bad faith and totality of circumstances analysis are subjective in nature and focus on a debtor's actions and intent, the "Means Test" set forth in § 707(b)(2) is objective and focuses on a debtor's finances. In considering whether the grant of Chapter 7 relief would be an abuse of the Bankruptcy Code, a court "shall presume" abuse if the debtor's current monthly net income is more than permitted expenses by a set amount.[42] If a debtor's monthly net income is

---

[42] *See* 11 U.S.C. § 707(b)(2)(A)(ii), (iii), and (iv).

$214.17 or more (at least $12,850 to fund a 60-month plan), the filing is presumed abusive. Conversely, if a debtor has less than $124.59 per month in net income (less than $7,700 to fund a 60-month plan), the filing is not presumed abusive. Finally, if a debtor's monthly net income is more than $124.59 but less than $214.17, the case will be presumed abusive if, after being multiplied by 60 (the maximum number of months in a Chapter 13 plan), the sum would pay 25% or more of the debtor's nonpriority unsecured debt.[43] Once abuse is presumed, the debtor has the ability to rebut this presumption by showing special circumstances exist to justify an income or expense adjustment.[44]

Steed alleges that by knowingly misrepresenting and omitting income and assets, the Debtors were able to avoid a presumption of abuse under § 707(b)(2)'s Means Test. Specifically, he points out that the Debtors have failed to count Mrs. Toone's draws of over $18,700 from ProMobility, which average $3,116.67 per month, in Form 22A-1 (the Means Test calculation). Also, Steed notes that Mrs. Toone's monthly salary was "inexplicably reduced" from $4,142 to $3,811.50.[45] Lastly, he argues that the entry of $0 for "Debtor 2" as salary in the March 8, 2016 amendment to schedules is incorrect.

Mrs. Toone's responses to these contentions are imprecise. For example, she states: "I am not exactly certain where Mr. Steed is getting the numbers from that he's using for his calculations."[46] In fact, Steed's numbers are taken directly from the Debtors or their filings with the Court. Moreover, at the May 31, 2016 hearing on the Motion, counsel for the Debtors acknowledged that there were mistakes with respect to the latest version of the Means Test calculation as to Mr. and Mrs. Toone's income.[47]

---

[43] *See In re Tauter*, 402 B.R. 903, 905-06 (Bankr. M.D. Fla. 2009).
[44] *See* 11 U.S.C. § 707(b)(2)(B)(i).
[45] Supplemental Declaration of Kevin Steed in Support of Motion to Dismiss ("Steed Supp. Decl."), [ECF 58], ¶ 5.
[46] S. Toone Cert., ¶ 4.
[47] Transcript of Hearing on Motion to Dismiss [ECF 56], 40:15-22.

The Debtors themselves admit that they have failed to account for various expenses and liabilities, including $283.58 a month for life insurance and $281.90 loan repayments on a 401k account. Additionally, there are tax liabilities from the final year of operating EAH, contributions to non-profit religious groups, and contributions to their children's college savings account that the Debtors claim are not included.[48]

Steed argues and the Debtors acknowledge that the figures appearing on the most current form of their Means Test calculation are incorrect and/or incomplete. It is the Debtors' obligation to provide complete and accurate information to the Court for the purpose of the Means Test analysis under § 707(b)(2). They have not done so. Accordingly, the Debtors shall have 20 days to disclose their actual financial circumstance by filing amended Schedules B, C and I, as well as a Statement of Financial Affairs, and Official Forms 22A-1 and 22A-2. The issue of whether the Debtors have satisfied the Means Test will be addressed at the hearing on the Order to Show Cause, which is being entered herewith.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is denied without prejudice, and the Court will issue an Order to Show Cause as set forth above.

*John K. Sherwood*

_____
JOHN K. SHERWOOD
UNITED STATES BANKRUPTCY JUDGE

Dated:  October 17, 2016

---

[48] S. Toone Cert., ¶ 7. A review of the 401k statement provided by Steed indicates that the Debtors may have made a withdrawal of over $9000 in early 2015. *See* Wolstein Decl., Ex. V.